UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOSEPH SHERMAN, SHAKEEM TAYLOR, TONY
GENTRY, and ABDULLAH MCPHERSON

                             Plaintiffs,

        -against-

REDBURN PROPERTY SERVICES, LLC,
CHRISTOPHER COLWELL, *Individually,* ERIK
SMITH, *Individually,* MICHAEL LEVIT, *Individually,*
JUSTIN KRAMER, *Individually,* and JOHN BARNES
*Individually,*

                           Defendants.
-------------------------------------------------------------------X

Case No.:  1:22-CV-1196 (BKS/CFH)

COMPLAINT

PLAINTIFF DEMANDS
A TRIAL BY JURY

      Plaintiff, by Plaintiff's attorneys, PHILLIPS & ASSOCIATES, ATTORNEYS AT LAW,

PLLC, hereby complains of the Defendant(s), upon information and belief, as follows:

## NATURE OF THE CASE

1.    Plaintiff complains pursuant to 42 U.S.C. § 1981 (Section 1981); and the New York State

    Human Rights Law ("NYSHRL"), New York State Executive Law § 296, *et seq*. Plaintiffs

    seek damages to redress the injuries Plaintiffs have suffered as a result of being discriminated

    against on the basis of Plaintiffs' race (Black). **Plaintiffs suffered a hostile work**

    **environment when Defendant REDBURN's supervisors regularly called them**

    **"nigger," "monkey," and other racial epithets; refused to grant promised promotions**

    **or evaluations; regularly assigned Plaintiffs the worst tasks available; and regularly**

    **demanded Plaintiffs perform tasks outside their job duties as well as outside of the law.**

## JURISDICTION AND VENUE

2.    Jurisdiction of this Court is proper under 42 U.S.C. § 1981 and 28 U.S.C. §§ 1331 and 1343.

3. This Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), based upon the fact that the claims alleged herein took place within the Northern District of New York.

## PARTIES

5. That at all times relevant hereto, Tony Gentry (Plaintiff GENTRY) was a resident of the State of New York and the County of Albany.

6. That at all times relevant hereto, Joseph Sherman (Plaintiff SHERMAN) was a resident of the State of New York and the County of Ulster.

7. That at all times relevant hereto, Abdullah McPherson (Plaintiff MCPHERSON) was a resident of the State of New York and the County of Albany.

8. That at all times relevant hereto, Shakeem Taylor (Plaintiff TAYLOR) was a resident of the State of New York and the County of Albany.

9. At all times material, Defendant Redburn Property Services, LLC ("REDBURN") was and is a foreign business corporation organized under the laws of the State of New York, with a corporate office at 172 River Street, Troy, NY 12090.

10. At all times material, Defendant REDBURN operates under and pursuant to the laws of the State of New York, providing property services at various sites, including 701 River Street, Troy, NY (hereafter referred to as the "Troy Worksite"), 45 Columbia Street, Albany, NY (hereafter referred to as the "Albany Worksite"), and the Schenectady Off Track Betting Headquarters located at 510 Smith Street, Schenectady, NY (hereafter referred to as the "Schenectady Worksite"). These worksites are collectively referred to as "the Worksites."

11. At all times material, Defendant REDBURN had four or more employees.

12.   At all times material, Defendant REDBURN was Plaintiffs' employer under Section 1981.

13.   At all times material, Defendant REDBURN was Plaintiffs' employer under the NYSHRL.

14.   At all times material, Defendant REDBURN was contracted to provide construction and property services at the Troy Worksite, Schenectady Worksite, and Albany Worksite.

15.   At all times material, Defendant ERIK SMITH ("SMITH") was an employee of Defendant REDBURN.

16.   At all times material, Defendant SMITH held the position of "Lead Supervisor," acting as middle management between Defendant CHRIS COLWELL ("COLWELL") and the foremen and workers on the Schenectady Worksite, Troy Worksite, and Albany Worksite. Defendant SMITH was also responsible for Plaintiffs' payroll.

17.   At all times material, Defendant SMITH was Plaintiffs' supervisor and had supervisory authority over Plaintiffs and the Foremen supervising Plaintiffs more directly.

18.   At all times material, Defendant JUSTIN KRAMER ("KRAMER") was a Foreman and had supervisory authority over Plaintiffs when they were working at the Albany Worksite in the garage located at 45 Columbia Street (hereafter referred to as the "Garage").

19.   As of the time of his promotion from Foreman to Supervisor, Defendant MICHAEL LEVIT (LEVIT) had supervisory authority over Plaintiffs.

20.   At all times material, Defendant JOHN BARNES ("BARNES") was a Foreman and had supervisory authority over Plaintiffs when they were working under him at the Schenectady Worksite.

21.   At all times material, Defendant COLWELL had the power to hire Plaintiffs.

22.   At all times material, Defendant COLWELL had the power to fire Plaintiffs.

23.   At all times material, Defendant COLWELL had the power to demote Plaintiffs.

24. At all times material, Defendant COLWELL had the power to promote Plaintiffs.

25. At all times material, Defendant COLWELL had the power to directly affect the terms and conditions of Plaintiffs' employment.

26. At all times material, Defendant SMITH would make recommendations of who to hire, terminate, and promote. Upon information and belief, Defendant COLWELL would typically act on Defendant SMITH's suggestion.

27. At all times material, Defendants SMITH and COLWELL had the power to direct Plaintiffs' daily work activities.

28. Defendant REDBURN, Defendant SMITH, Defendant KRAMER, Defendant BARNES, Defendant LEVIT, and Defendant COLWELL are at times collectively referred to herein as "Defendants."

29. Defendant SMITH, Defendant KRAMER, Defendant BARNES, Defendant LEVIT, and Defendant COLWELL are at times collectively referred to herein as "Individual Defendants."

**Allegations Relating to all Plaintiffs**

30. This case involves continuous and systematic discrimination against Plaintiffs on the basis of their race (Black).

31. Specifically, Plaintiffs were denied promised promotional opportunities on the basis of their race (Black); Plaintiffs were paid less than their Caucasian counterparts; Defendant SMITH and Defendant COLWELL regularly demanded Plaintiffs to perform demeaning and/or illegal acts outside their job duties that Caucasian workers were never asked to perform; Plaintiffs were regularly demeaned in front of coworkers and supervisors (who were in a position to promote or otherwise advance them) by Defendant SMITH, Defendant

4

BARNES, Defendant KRAMER, Defendant COLWELL, and Defendant LEVIT. This treatment was exclusively directed toward Black workers during the relevant time period.

32. Plaintiffs were all hired with the job description of "Construction Laborer."

33. Plaintiffs were all hired at or near the height of the Covid pandemic after several aspects of the New York lockdown went into effect in March 2020, including Governor Cuomo halting all nonessential construction sites in New York State.

34. Plaintiffs TAYLOR, MCPHERSON, and SHERMAN were hired shortly before nonessential construction work was paused by New York State.

35. Plaintiffs were unceremoniously fired after working throughout a large part of the pandemic lockdown period, after collectively complaining dozens of times of a hostile workplace and safety hazards faced exclusively, or nearly exclusively, by Black workers during the relevant period.

36. Upon opinion and belief, there are disproportionately few Black workers employed by Defendant REDBURN, and none of the Black laborers were promoted beyond the entry-level at any of the Worksites during the relevant time period.

37. There is no Black person in a position of leadership at Defendant REDBURN at any level. As of 08/05/2022, of the 47 employees featured on their website, only one Black person, a Staff Accountant named Wari Isaac, is featured. This individual is featured at the bottom of this webpage and is one of only eight people featured with no photo despite working there for over a year (according to his LinkedIn profile). A thorough search of Defendant REDBURN's website and a subsequent Google search of Mr. Isaac is necessary to even confirm that any Black person works at Defendant REDBURN from their website.

38. Upon opinion and belief, the number of Black workers is disproportionately small considering the demographics of the Worksite's surrounding areas.

39. Plaintiffs were all hired through an advertisement on Indeed.com, or after an interview by Defendant COLWELL or Defendant SMITH.

40. There is no longer any listing available for "Construction Laborer," however, a search of Indeed.com and the Defendant REDBURN website yielded an advertisement for "General Labor" that, upon opinion and belief, is the closest analog. This includes a description of the duties, reading "Tasks may include cleaning and preparing a job site, loading and delivering material, and using a variety of tools and machines," that the job required "Observance of all safety rules and regulations," and "Pay dependent on experience."

41. In the advertisement or interview, it was represented to Plaintiffs that they would be working Monday to Friday from approximately 7 a.m. to approximately 4 p.m., with overtime being available but optional.

42. Defendant SMITH made work assignments for Plaintiffs and other workers on site.

43. Upon information and belief, Defendant SMITH coined the nickname "felony crew" for a group consisting of Plaintiffs and certain other Black workers in or around November 2021. This nickname spread, and soon nearly every Foreman and Supervisor referred to the all-Black crew as the "felony crew" or "felon crew."

44. While the "felony crew" was often broken up to fill gaps of other crews, they would typically be given the worst tasks as an all-Black crew and regularly rotated between Worksites.

45. Plaintiffs were typically treated worse than their Caucasian coworkers in a racially integrated crew as convenient gap-fillers that were openly and notoriously abused by Defendant SMITH, Defendant BARNES, Defendant KRAMER, Defendant LEVIT, and Defendant

COLWELL. Because of this, other supervisors and coworkers understood there would be no consequences for mistreating Plaintiffs.

46. Upon opinion and belief, no Caucasian worker was ever referred to as a "felon" or part of the "felony crew." Plaintiff's Caucasian coworker who goes by the name "Chip," for instance, has a felony conviction, but was not referred to as part of the "felony crew" and he was in fact promoted by Defendant REDBURN.

47. Several of Defendant REDBURN's Black laborers were referred to by Defendants as part of the "felony crew." This included all Plaintiffs as well as other employees with first names: "Devon," and "Charles."

48. "Josh" (last name unknown), another Laborer who worked alongside Plaintiffs, was also similarly mistreated on the Worksites.

49. Josh was hired in or around August 2020 and resigned in or around February 2021 due to poor treatment and not receiving pay for all hours worked.

50. In or around September 2020, Josh alerted Plaintiffs that they were not being fully paid.

51. Plaintiffs and other workers would gather at site locations to receive their job assignments and they would speak and compare assignments and pay.

52. Plaintiffs learned they were being paid less than their coworkers.

53. Defendant SMITH would approach Plaintiffs at the daily gathering and use the word "**nigga**," "**nigger**," "**monkey**," and other **racial slurs or offensive, racialized language** in front of Caucasian coworkers, foremen, and supervisors. Defendant BARNES, Defendant LEVIT, and Defendant KRAMER would use this same language. When Defendant COLWELL was on-site, he would often use the same type of language.

54. Defendant COLWELL was less involved with Plaintiff's day-to-day work; however, he would also use the same **offensive, racialized language** when speaking with or about Plaintiffs.

55. Plaintiffs all complained to Defendant SMITH throughout their employment about workplace hazards, disparate treatment, and openly used racial slurs. Defendant SMITH would respond in sum and substance that Plaintiffs "need to just deal with it."

56. In or around May 2020, Plaintiff GENTRY called HR to complain about environmental/safety hazards and offensive racial language. Upon opinion and belief, no action was taken.

57. After internal complaints had been ineffective, Plaintiff MCPHERSON, Plaintiff SHERMAN, and their coworker, Charles, all complained to OSHA. Plaintiffs complained to OSHA in part about the complete lack of PPE (masks) available to Plaintiffs when they were made to work in the Garage. The Garage was often extremely dusty/hazardous and had insufficient ventilation. The dust and debris in which Plaintiff worked was so thick it was often hard for them to see. Plaintiffs were made to work in these conditions without a mask which was essential for protecting them from inhaling particles.

58. Defendant SMITH would often threaten to "'sic my felony crew" on a Caucasian worker like an attack dog, making Plaintiffs uncomfortable and creating hostility between the Caucasian workers and Black workers.

59. Defendant SMITH would repeatedly and habitually give Black workers on the "felony crew" the assignments that Caucasian workers refused to perform. This included working in hazardous conditions, such as the Garage during debris and dust abatement.

60. Plaintiffs began working in the Garage at different times, but were all working in the Garage by the end of October 2020.

61. The Garage was considered the least desirable because it was dark, dirty, had poor ventilation, exposed wiring, and several other environmental hazards that made it unsafe and uncomfortable. For those reasons, on the Albany Worksite, it was referred to as "the dungeon."

62. Plaintiffs were tasked with finishing the floors in the Garage. When the initial attempt to use epoxy failed, Defendant REDBURN required them to remove all the dust, dirt, and debris from the floors.

63. The conditions became increasingly hazardous in or around November 2020, when they were tasked with cleaning the debris using a machine referred to as "the Zamboni." This device is like a small street sweeper.

64. The Zamboni kicked up enough dust to reduce visibility to about ten feet, causing or exacerbating breathing issues.

65. Plaintiffs made repeated requests for PPE such as respirators, but their requests were repeatedly denied, and they were provided only minimal protective equipment such as surgical masks that were not effective and not always available.

66. PPE was typically provided to the Caucasian workers at that time.

67. Upon opinion and belief, flooring work at the Capital Repertory Theater began in or around November 2021 and was staffed by the "felony crew."

68. In or around early January 2021, Plaintiff MCPHERSON observed Defendant COLWELL speaking with Defendant SMITH. Defendant COLWELL told Defendant SMITH to "get his monkeys in line" because they had a deadline on an assignment to finish the flooring in the

Capital Repertory Theater, to which Defendant SMITH said he would "light a fire under their asses."

69.     After the flooring in the Capital Repertory Theater was completed in or around February 2022, Defendant REDBURN brought pizza to the worksite to host a celebratory party, at which most of the Caucasian attendees received an envelope with a bonus.

70.     Despite being the staff who predominantly worked on the flooring for which the party was being thrown, nobody in the "felony crew" received any bonus.

71.     Plaintiffs all worked for at least some time in the Garage during the worst of the hazardous conditions which began in November 2020. The workers in the Garage during this time were exclusively Black, except for the site's Foreman, Defendant KRAMER, who spent less time in the basement of the Garage, the most hazardous part of this worksite, than the "felony crew" workers.

72.     Upon opinion and belief, during this debris abatement, adjacent restaurants had complained about the dust coming from the windows and open doors. As a result, the site was visited by one of the Defendant REDBURN owners, John Blackburn, to inspect the site in or around February 2021. After this visit, Defendant SMITH instructed that all the windows and doors were to be closed and taped to not allow dust to escape, further exacerbating the unsafe conditions.

73.     In or around December 2020, Plaintiff MCPHERSON felt ill from inhaling the dust in the Garage and subsequently sought medical treatment at Whitney Health Care in Watervliet, NY. He missed approximately two days because of his illness.

74.     In or around February 2021, Plaintiff SHERMAN, after hearing respirators were delivered to a building at the Albany Worksite, (the Kenmore Ballroom Apartments), started opening

boxes located in the building. After opening many boxes, Plaintiff SHERMAN was able to find respirators; however, they appeared to have been hidden.

75.  Upon seeing the "felony crew" working with respirators and learning where they were found, Defendant SMITH lost his temper and yelled something to the effect of **"Are you shitting me?! COLWELL is going to be pissed!  He was saving those masks for something else. You can't be running around doing what you want, this isn't Burger King, you don't have it your way, you guys are being some dumb motherfuckers."** Plaintiff SHERMAN specifically remembers Defendant SMITH finishing his tirade with: "Stop being **porch monkeys** and get back to work!"

76.  In or around early March 2021, the Garage was shut down for one week by OSHA.

77.  In or around mid-March 2021, the Garage re-opened for work. In or around late March 2021, after most of the dust had been removed by Plaintiffs, several Caucasian workers were also tasked with work in the Garage. By then, the hazardous conditions had been all but completely abated, and nearly all of the Caucasian workers had respirator masks.

78.  Additionally, Defendant SMITH and Defendant COLWELL demanded Plaintiffs come in early, stay late, or leave their current assignment, often at a different site, to clean up after a party Defendant COLWELL would host inside one of the more-completed model apartments under construction at the Albany Worksite.

79.  On these occasions, the model apartment would be very messy, littered with empty beer cans, cocaine and drug paraphernalia, used condoms, and occasionally what appeared to be a sex worker still in the model apartment when they were cleaning.

80.  Upon opinion and belief, no Caucasian worker was asked to clean up after Defendant COLWELL's personal events during the relevant period.

81. As per workplace norms established on the Worksites, workers were typically allowed a roughly 15 minutes grace period regarding work start times, with no discipline, official or unofficial, enforced against them.

82. However, on several occasions, certain Plaintiffs were written up for being fewer than 15 minutes late, including several occasions when Caucasian coworkers would return from the same break several minutes later. The Caucasian workers would walk past but not be written up or confronted on the issue of tardiness.

83. Upon opinion and belief, Plaintiffs received disproportionate, arbitrary enforcement of rules as a pretense to deny them raises and/or promotions, and to set the groundwork for firing them. Upon opinion and belief, this was not experienced by any Caucasian workers during the relevant period.

84. Defendant SMITH organized vans to provide transportation to and from the work site for around 75% of the Caucasian workers. Both Defendant TAYLOR and their coworker, Charles, drove to the site to help pick up the vans. Despite helping to retrieve the vans, transportation assistance was never offered to Plaintiffs during the relevant period.

85. Defendant COLWELL repeatedly and habitually hired Caucasian workers with less experience than Plaintiffs at a higher rate, despite comparable job descriptions clearly indicating that pay would be based on experience.

86. Upon opinion and belief, this was also part of the original Indeed.com post that induced Plaintiff TAYLOR and Plaintiff GENTRY to work for Defendant REDBURN, and a similar if not same description was given to Plaintiff SHERMAN and Plaintiff MCPHERSON.

87. This increase in pay for Caucasian workers included "Chip," a Caucasian worker with a felony – at the time of his hire he was paid approximately $10 per hour more than Plaintiff GENTRY, who had more relevant work experience.

88. Plaintiffs were never informed when promotional opportunities became available, despite several positions for Foreman opening and being filled by Caucasian workers, occasionally by newer workers or even workers that received on-the-job training by Plaintiffs.

89. Defendant COLWELL had the power to, and did, create positions/titles at his discretion, and had the power to fill same.  Throughout the creation and filling of these particular positions, Defendant SMITH repeatedly ignored Plaintiffs' multiple requests for job advancement opportunities. Defendant SMITH and Defendant COLWELL disproportionately promoted Caucasian, and not Black employees.

90. In or around January 2021, when Defendant SHERMAN approached Defendant SMITH requesting a raise in pay to what his Caucasian coworkers were making, Defendant SMITH told Plaintiff SHERMAN, "**nigga, your overtime is your raise**."

91. One of several Caucasian workers who was given a promotion from entry-level Construction Laborer to Foreman was Jason Horvath, referred to as "Chip" on the Worksites.

92. Chip was hired in or around January 2021, and worked until approximately late December 2021, when he was injured and no longer able to perform his work duties.

93. Chip was trained, in part, by Plaintiff SHERMAN.

94. Plaintiff SHERMAN also trained Chip on flooring at the Capitol Repertory Theater in the Albany Worksite, before being promoted.

95. Chip asked Plaintiff SHERMAN to work with his crew whenever possible due to Plaintiff SHERMAN's good work ethic.

96.  When Chip first started working at the Albany Worksite in the Garage, Defendant SMITH instructed him to work with the "felony crew." Chip had a felony and initially believed that he was being referred to as a felon; however, he was never considered part of the "felony crew" by Foremen or Supervisors.

97.  Chip was hired through Ed Corbett at or about an hourly rate of $28 per hour, significantly higher than any of the Plaintiffs, including Plaintiff GENTRY, who had 15 years of experience in construction.

98.  Within just two to three months after Chip was hired, Chip received a promotion to Foreman. This was significantly less time than Plaintiff GENTRY and Plaintiff TAYLOR were working for Defendant REDBURN.

99.  When Plaintiff GENTRY and Plaintiff TAYLOR applied for employment, they were advised by Defendant REBURN that they may be eligible to receive a raise after three months and would receive a performance review every three months.

100.  Defendant SMITH and Defendant COLWELL also promised potential pay increases and quarterly employment reviews to Plaintiff MCPHERSON and Plaintiff SHERMAN when they were hired.

101.  The potential for wage increases was verbally affirmed by Defendant SMITH when all Plaintiffs began working.

102.  On several occasions, Defendant SMITH stated that a raise was coming, but none of the Plaintiffs received raises.

103.  Defendant COLWELL repeatedly gave raises to Caucasian employees. This included Caucasian workers who had worked fewer overtime hours than Plaintiffs and were working for Defendant REDBURN for briefer time periods than Plaintiffs.

104. Upon opinion and belief, the Caucasian workers at the Worksites typically worked at or around 40 hours per week.

105. Upon opinion and belief, Chip, Defendant KRAMER, and Defendant LEVIT worked fewer hours than Plaintiffs, but still received raises and promotions.

106. Upon information and belief, Defendant LEVIT habitually used drugs on the Worksites and was often intoxicated while working.

107. Plaintiffs' overtime was often mandatory, with Plaintiffs being told on a near weekly basis by Defendant SMITH or Defendant COLWELL that they would need to work overtime, or risk losing their jobs. Plaintiffs were often given little or no notice.

108. Plaintiffs' overtime included one occasion while working on a Sunday at the Capital Repertory Theater at the Albany Worksite. Plaintiffs saw Supervisor Austin struggling when his crew refused to perform overtime. The particular crew walked off the site at the end of their day at or around 3 p.m. without completing the installation of PVC siding assigned to the crew.

109. Plaintiffs offered to assist Austin and remained working for around 9 hours, until approximately midnight, to complete the work abandoned by their Caucasian coworkers who refused to complete the work.

110. This work was outside of Plaintiff's normal hours and on a Sunday, a day that they were not supposed to be working as per their job description.

111. On a roughly bi-monthly basis, Plaintiffs were not paid fully, or not paid on time. When Plaintiffs complained to Defendant SMITH, they would be given an excuse and told that they would be paid as soon as Defendant SMITH could "make it happen."

112. On several occasions, Plaintiffs would reach out to Supervisor Austin, with whom they developed a friendly relationship after helping him complete the previously mentioned late-night job. Austin would then try to push Defendant SMITH to pay Plaintiffs.

113. On several occasions, Defendants would tell Plaintiffs to meet them at a bar to provide their late paychecks.

114. Occasionally Plaintiffs were not always paid the full amount of earnings they were owed.

115. In or around late December 2021, there was a Christmas party that most employees at that Worksite attended. During this party, Plaintiffs were singled out and praised by John Blackburn, one of the owners of Defendant REDBURN, as saving them substantial money and completing significant extra work through their overtime. At this party, Defendant SMITH assured them that the raise they had spoken of several times would be on its way.

116. In or around January 2022, after many unsuccessful attempts to have the disparate treatment, environmental hazards, and racial slurs addressed, Plaintiff GENTRY spoke with Defendant SMITH about his working conditions and threatened to go to Human Resources. Plaintiff GENTRY was fired the next day.

117. Crews of 4 or more would typically have a Foreman whose job title and pay would be higher than the other laborers, however, the "felony crew" often had no Foreman.

118. The lack of a Foreman was particularly noticeable from in or around November 2020 until in or around February 2021 during renovations on the Capitol Repertory Theater. At that time, there were as many as six workers being supervised by Plaintiff SHERMAN, none of whom had received a promotion to Foreman. Notwithstanding, Plaintiff SHERMAN was often carrying out all the duties of a Foreman.

119. In or around early March 2022, Plaintiff SHERMAN was disciplined by Defendant SMITH when Defendant SMITH confirmed that Plaintiff SHERMAN had made an OSHA complaint about the conditions in the Garage.

120. In April of 2022, Plaintiff SHERMAN was fired. Upon opinion and belief, he was terminated because Defendant SMITH discovered that Plaintiff SHERMAN was one of several individuals that filed OSHA complaints regarding the environmental hazards regularly faced by Plaintiffs.

121. Upon opinion and belief, Plaintiff SHERMAN was also terminated due to his regular complaints of disparately poor treatment faced by the "felony crew."

122. Plaintiff MCPHERSON also made complaints about working conditions to OSHA.

123. Within approximately two weeks of Plaintiff SHERMAN being fired, all other Plaintiffs had been fired, as well as several other Black employees. This included other members of the "felony crew."

124. Upon opinion and belief, this group of related firings did not include the Caucasian Foremen overseeing Plaintiffs' work at any of their Worksites, nor any of the Caucasian workers with whom they had worked to complete projects. However, it included roughly 80% of the remaining Black workforce within a period of several weeks towards the end of the labor shortage created by Covid.

125. Other than Plaintiff SHERMAN, all Plaintiffs were told their terminations were due to a "work slowdown." Plaintiff SHERMAN was told by Foreman Corbett that he was being fired because he was not a skilled laborer.

126. However, upon information and belief, Defendant REDBURN quickly hired Caucasian laborers to replace Plaintiffs.

**Plaintiff Joseph Sherman**

127. Plaintiff SHERMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint.

128. Plaintiff SHERMAN was hired on or about October 26, 2020, by Defendant SMITH and worked until April 4, 2021.

129. Plaintiff SHERMAN worked approximately 50 hours per week and sometimes as many as approximately 72 hours in one week.

130. Plaintiff SHERMAN earned $16.75 per hour and $25.13 for overtime work.

131. On several occasions when Plaintiff SHERMAN's check and hours were less than what he worked, the shortfall was made up in cash or personal checks.  On other occasions, the full amount was never paid.

132. Plaintiff SHERMAN primarily worked at the Albany Worksite in the Capitol Repertory Theater and Garage, but he also worked in a few different buildings in the Schenectady Worksite and Troy Worksite as well.

133. The racial slurs from Defendant SMITH toward Plaintiff SHERMAN began on his first day of employment, with Defendant SMITH stating, "**My nigga I hope you work like your cousin** [Plaintiff TAYLOR]." Defendant SMITH observed Plaintiff SHERMAN's discomfort with the racial comment and quickly said, "**I hope you don't mind me talking like this**." He then added that he was a felon as well.

134. Obviously, Defendant SHERMAN was extremely offended by Defendant SMITH's use of the "n" word.

135. Defendant SMITH had become accustomed to and comfortable with using **abusive, racialized language**.

136. Similar to the other Plaintiffs, Plaintiff SHERMAN would often be used as a gap-filler on several different crews, such as occasionally working at the Schenectady Worksite with the crew run by Defendant BARNES.

137. When working with Defendant BARNES, Defendant BARNES would use racial slurs such as "**nigger,**" "**nigga,**" and "**monkey,**" with both Plaintiff SHERMAN and Plaintiff GENTRY.

138. On several occasions, Defendant SMITH asked Plaintiff SHERMAN to buy cocaine for Defendant COLWELL. On these occasions, Defendant SMITH would tell Plaintiff SHERMAN that Defendant COLWELL was the head of his entire department, and the one that would make all the important decisions regarding promotions and raises, and that this was his opportunity to advance in the company.

139. From in or about November 2020 until Plaintiff SHERMAN began refusing to perform personal errands in or about March 2021, Defendant COLWELL or Defendant SMITH would call Plaintiff SHERMAN approximately every other week, demanding he help move Defendant COLWELL's car when he was too intoxicated to drive.  On these occasions, Plaintiff SHERMAN would drive Defendant COLWELL's car to his home with Defendant SMITH in another car, and then be driven back by Defendant SMITH.

140. Demands to clean the model apartment after Defendant COLWELL's parties mentioned *supra* would be made of Plaintiff SHERMAN roughly every other week until he began to refuse to do so approximately one month prior to his termination.

141. Upon information and belief, Caucasian workers were not instructed to clean up after Defendant COLWELL's parties, nor to perform other personal errands for him during the relevant period.

142. Plaintiff SHERMAN worked in the Garage, as well as other sites, from in or around October 2020 to approximately March 2021.

143. In or around early November 2020, Plaintiff SHERMAN worked for several hours removing doorframes in the Off-Track Betting ("OTB") building at the Schenectady Worksite with one other worker named Fritz.

144. The OTB Building had red tape warnings of asbestos.

145. Plaintiff SHERMAN called Defendant SMITH about the asbestos warning tape and Defendant SMITH told him in sum and substance, "it's fine, there is no hazard."

146. Later that day when coming back from lunch, Plaintiff SHERMAN observed a crew arriving in extensive, full-body safety suits that were there to perform asbestos removal in the OTB building where Plaintiff SHERMAN was working earlier that day.

147. Defendant SMITH lied to Plaintiff SHERMAN about the presence of asbestos in the building where he was instructed to work.

148. On or about March 2021, Plaintiff SHERMAN worked at the Schenectady Worksite in an elevator shaft with no safety equipment taking down scaffolding. This was a particularly dangerous assignment he worked on with Charles "Tree" Collins and "James" (last name unknown).

149. Another crew hired as independent contractors worked there as well. In their crew they had a safety specialist tasked with ensuring that their crew followed proper safety protocol for regulatory and safety policy compliance.

150. This safety specialist informed Plaintiff SHERMAN that scaffolding work was dangerous and required special training. He then directed Plaintiff SHERMAN to look up and down, indicating that he could potentially fall the entire distance of several floors to the bottom,

and that the scaffolding, workers, and everything else above him would fall onto him and likely kill him, so a safety harness and other protective equipment were essential.  Neither Plaintiff SHERMAN, nor the other Black employees working with him that day, were offered any safety equipment for that job.

151. Defendant KRAMER and Defendant LEVIT were promoted during the relevant period.

152. Defendant LEVIT and Defendant KRAMER were observed on several occasions using drugs on-site.

153. On several occasions at the Schenectady Site, Defendant LEVIT would start arguments with Plaintiff SHERMAN by making disparaging racial comments such as that "*Blacks did not work as hard as whites*."

154. In or around January 2021 Plaintiff SHERMAN helped to train Chip, a new employee who was promoted to be his supervising Foreman.

155. Plaintiff SHERMAN's training of Chip included an in-depth tutorial on how to install ceramic dance flooring in the Capitol Repertory Building, a task that is significantly more demanding than average floors.

156. Chip was so impressed with Plaintiff SHERMAN's knowledge and work ethic that he requested Plaintiff SHERMAN work on his crew whenever possible.

157. Additionally, Plaintiff SHERMAN also performed work that would have been more accurately described under the job title of "Foreman" rather than Construction Laborer.

158. As per Defendant REDBURN's practices observed on-site, Foremen were typically assigned a crews of 4 laborers or more.

159. Plaintiff SHERMAN's Foreman-like duties outside of his job description included acting as a go-between for Defendant SMITH and the "felony crew" to coordinate which supplies were needed.

160. Plaintiff SHERMAN further decided who would remain on his crew at the Capitol Repertory Theater building and which members of his crew would go to perform other tasks requested by Defendant SMITH.

161. Plaintiff SHERMAN orchestrated walk-throughs with Heather Newman, the Director of Architecture, at the Capitol Repertory Theater building, where she would explain what needed to be completed. Plaintiff SHERMAN would provide a timeline and materials list to her. In one instance, Ms. Neuman quickly filled Plaintiff SHERMAN's request for a dumpster, demonstrating significant trust in Plaintiff SHERMAN, recognized by fast resource allocation of expensive equipment.

162. Plaintiff SHERMAN acted as a clear leader when the "felony crew" had no Foreman despite often having four to six laborers to supervise. He liaised between Defendant SMITH and Foremen of other crews working on other tasks in other areas of the Capitol Repertory Theater.

163. In or around November 2020, Plaintiff SHERMAN, Plaintiff TAYLOR, and Plaintiff MCPHERSON were directed to move fencing equipment from one off-site location to another by Defendant SMITH. This was presented as yet another personal errand for Defendant COLWELL. Defendant SMITH assured them that the fencing equipment was the property of Defendant SMITH and Defendant COLWELL, and that they were renting the garage in which it was located.

164. Plaintiffs MCPHERSON, SHERMAN, and TAYLOR only discovered the property was stolen at Defendant SMITH's direction the next day when a supervisor appeared on-site and asked questions about the subject fencing, informing them it was stolen.

165. When confronted on the issue of theft from the worksite, Defendant SMITH replied in sum and substance that, "this sort of thing happens all the time on construction sites," and that "the fencing is insured, so [Defendant REDBURN] wouldn't actually lose any money."

166. Upon opinion and belief, no Caucasian worker was asked to do anything illegal for Defendant COLWELL or Defendant SMITH during Plaintiff MCPHERSON's employment.

167. In or around March 2021, Defendant SMITH instructed Plaintiff SHERMAN to meet him and another employee, Austin, at a local U-Haul office. Defendant SMITH initially told Plaintiff SHERMAN that Defendants were going to rent a truck and needed Plaintiff SHERMAN to drive it to Poughkeepsie, NY to pick up supplies. Once they arrived at the U-Haul office, Defendant SMITH explained that he couldn't rent the truck with the Defendant REDBURN account, and that Plaintiff SHERMAN's name would have to be on the rental agreement.

168. Plaintiff SHERMAN was not comfortable taking responsibility for renting the truck for work purposes, but Defendant SMITH pressured him to agree. He told Plaintiff SHERMAN repeatedly that this was his "time to shine." Plaintiff SHERMAN felt he had no other choice. Then, after he agreed, he was informed that he would be driving to Yonkers, NY, not Poughkeepsie. Plaintiff SHERMAN was manipulated into taking the vehicle on an even longer trip and was extremely uncomfortable with the arrangement.

169. Defendant SMITH also made it very difficult for Plaintiff SHERMAN to be reimbursed for the tolls he incurred from the long drive to Yonkers.

170. For several weeks after, Defendant SMITH did not compensate Plaintiff SHERMAN for approximately $50 of tolls incurred in his trip to secure materials for another crew at the Capitol Repertory Theater.  Because of this debt, Plaintiff SHERMAN would not be able to rent a U-Haul for an upcoming move until it was paid.

171. After several requests, Plaintiff SHERMAN had an argument about the U-Haul toll compensation with Defendant SMITH. After this argument, Plaintiff SHERMAN requested a very brief break from his work to speak with a supervisor. Plaintiff SHERMAN then approached Matthew Crudo, Senior Vice President with seniority over both Defendant COLWELL and Defendant SMITH, about payment for the tolls. Upon hearing about the situation, Matthew Crudo said that he would handle it.

172. The day after Plaintiff SHERMAN approached Mr. Crudo, Defendant SMITH approached and screamed at Plaintiff SHERMAN, claiming that he was always going over Defendant SMITH's head.

173. The day after Defendant SMITH screamed at Plaintiff SHERMAN, Plaintiff SHERMAN observed him having a heated argument with Foreman Corbett when he was about to go on break.

174. Foreman Corbett stopped yelling at Defendant SMITH, approached Plaintiff SHERMAN, and said in sum and substance, "Smith is scared to tell you, but you're fired, we need skilled workers and you're not skilled."

175. After firing Plaintiff SHERMAN, Ed Corbett said "Sha and Ha are next."  Sha is a nickname of Plaintiff TAYLOR, and Ha is a nickname of Plaintiff MCPHERSON. Approximately one week later, both Plaintiff TAYLOR, and Plaintiff MCPHERSON were fired.

176. Defendant SMITH interjected to say that Plaintiff SHERMAN was not being fired, rather, that he was being laid off and would be re-hired when they had enough work. However, Defendant SMITH never followed up, and Plaintiff SHERMAN was effectively terminated.

**Plaintiff MCPHERSON**

177. Plaintiff MCPHERSON repeats and realleges each and every allegation made in the above paragraphs of this complaint.

178. Plaintiff MCPHERSON is a Black male.

179. In or around June 2020, Plaintiff MCPHERSON started working with Defendant REDBURN after receiving a recommendation from a friend and then being directly hired by Defendant COLWELL after an interview.

180. Plaintiff MCPHERSON worked approximately 50 hours per week, and as many as approximately 70 hours some weeks.

181. Plaintiff MCPHERSON earned approximately $18 per hour, and $27 per hour for overtime.

182. Plaintiff MCPHERSON worked until April 2021, when the last three Plaintiffs remaining at Defendant REDBURN were fired.

183. Plaintiff MCPHERSON immediately noticed the disparately poor treatment on the Worksites of Black individuals and began noticing the racial slurs of Supervisors and Foremen on or about the second week of employment.

184. Plaintiff MCPHERSON was often referred to as "Kobe," and Plaintiff TAYLOR and Plaintiff MCPHERSON were often referred to as "Shaq and Kobe," prominent Black basketball celebrities, by Foremen and coworkers.

185. Defendant SMITH would often threaten to "sic Shaq and Kobe" on a Caucasian coworker. Plaintiff MCPHERSON and Plaintiff TAYLOR were offended by Defendant SMITH's use of the racial and stereotypical nicknames.

186. In or around October 2020, Plaintiff MCPHERSON took the place of a Caucasian worker named "Fritz", joining Plaintiff TAYLOR to perform mold abatement at the Troy Worksite.

187. Despite several requests, PPE was never provided to Plaintiff MCPHERSON or Plaintiff TAYLOR at the Troy Worksite.

188. The mold abatement was performed with a dry ice blaster machine that blasted the mold off surfaces with a combination of dry ice pellets and compressed air.  This work was done without any safety equipment being offered to Plaintiff MCPHERSON or Plaintiff TAYLOR.

189. Of the dozens of videos on YouTube involving dry ice blasting, not a single one appears to involve any worker using the machine who does not have a respirator mask at all times, and the vast majority of them also involve a full-body hazard suit.

190. OSHA safety guidelines mention the airborne hazards of the materials being blasted, in this case, the wood, other surfaces, dry ice, and black mold, as well as the elevated levels of other debris and noise.  OSHA also cites that dry ice blasting can lead to carbon dioxide displacing oxygen, causing asphyxia, as well as burns from the dry ice.

191. Additionally, Plaintiff MCPHERSON and Plaintiff TAYLOR sprayed down the beams and other surfaces with Jomax Mold & Mildew Stain Remover and Armor Mold Remover & Disinfectant, both of which contain strongly worded safety warnings about contact with skin or eyes.

192. Upon opinion and belief, PPE was made available to Caucasian workers doing less hazardous work while Plaintiff MCPHERSON and Plaintiff TAYLOR were performing mold abatement without any PPE.

193. On October 23, 2020, Plaintiff MCPHERSON received medical treatment for inhaling black mold and other airborne hazards at Whitney Young Hospital, and there he was referred to Pulmonary & Critical Care Services in Troy, NY. Plaintiff MCPHERSON consequently missed approximately three days of work due to this illness.

194. In or around late October 2020, Plaintiff MCPHERSON was moved to primarily work at the Garage in the Albany Worksite until the debris abatement was finished in or around March 2021.

195. In or around November 2020, the basement in the Garage where all Plaintiffs worked became extremely hazardous due to the substantial amounts of dust kicked up.

196. In or around November 2020, Plaintiff MCPHERSON was manipulated into assisting Defendant SMITH and Defendant COLWELL steal fencing equipment, as described *supra.*

197. In or around December 2020, Plaintiff MCPHERSON felt ill from inhaling dust and sought medical care.  Plaintiff MCPHERSON subsequently missed approximately two days of work due to his illness.

198. **In or around late December 2020, during one of the many occasions that Plaintiff MCPHERSON approached Defendant SMITH about a raise, Plaintiff MCPHERSON was told by Defendant SMITH that he would have to "suck John Blackburn's dick" to get a raise.**

199. Upon opinion and belief, Defendant SMITH did not make similar statements to Caucasian workers.

200. In or around October 2020, Plaintiff MCPHERSON and Plaintiff TAYLOR accepted a side job from Defendant SMITH in which they were promised to be paid $400-600 each for working on Matthew Crudo's home. Matthew Crudo is the Senior Vice President of Defendant REDBURN.

201. Plaintiff MCPHERSON and Plaintiff TAYLOR worked on Matthew Crudo's home, replacing large beams.

202. After the work was completed, Defendant SMITH only paid Plaintiff MCPHERSON and Plaintiff TAYLOR **$200 total**, or between 16% and 25% of what was promised.

203. Defendant SMITH promised to add time to their hours to pay them through Defendant REDBURN's payroll, however, this never happened. When Plaintiff TAYLOR said that he wanted to speak with Matthew Crudo about this, Defendant SMITH threatened to fire him if he did.

204. Once the least-desirable work of debris abatement was completed in the basement of the Garage, commonly called "the dungeon," Plaintiff MCPHERSON was assigned predominantly to the Troy Worksite.

205. Defendant LEVIT began to aggressively micromanage the crew that Plaintiff MCPHERSON was a part of at the Troy Worksite. Upon opinion and belief, this was done in an attempt to set a pretense to fire Plaintiff MCPHERSON.

206. Soon after Plaintiff SHERMAN was fired, Plaintiff MCPHERSON was fired in or around April 2021.

**Plaintiff GENTRY**

207. Plaintiff GENTRY repeats and realleges each and every allegation made in the above paragraphs of this complaint.

208. Plaintiff GENTRY is a Black male.

209. In or around April 2020, Plaintiff Gentry was hired by Defendant REDBURN after responding to an advertisement on Indeed.com.

210. Upon opinion and belief, the advertisement included a representation that there would be the opportunity for a raise after three months, and a performance review every three months.  This potential for a raise was affirmed verbally by Defendant SMITH.

211. Plaintiff GENTRY never received a raise or performance review. Upon opinion and belief, Caucasian workers received raises and performance reviews during the relevant period.

212. Plaintiff GENTRY had 15 years of experience relevant to the work he was doing for Defendant REDBURN prior to his employment, which included assembling and disassembling scaffolding, demolishing walls, installing carpeting, and other general labor work on construction sites.

213. Plaintiff GENTRY typically worked approximately 45 hours per week, but sometimes as many as 55 hours per week.

214. Plaintiff GENTRY earned approximately $18 per hour, and $27 per hour for overtime work.

215. Upon opinion and belief, Plaintiff GENTRY was more experienced and worked more overtime than many of his Caucasian coworkers who were promoted during the time Plaintiff GENTRY was employed by Defendant REDBURN.

216. In addition to facing the same discrimination from the same Defendants as other Plaintiffs, Plaintiff GENTRY spent more time than the other Plaintiffs at the Schenectady Worksite, working there primarily from in or around June 2020 until approximately October 2020. There, he faced discrimination from Defendant BARNES.

217. Defendant BARNES used racial slurs like "**nigga,**" "**nigger**," and "**monkey**" on a daily basis towards Plaintiff GENTRY. He used these words in front of coworkers, Foremen, and Supervisors on the worksite.

218. Plaintiff GENTRY complained to Defendant SMITH about Defendant BARNES' use of racially offensive language. He requested a transfer to another work site.  Defendant SMITH told him that he would need to "deal with it." Upon opinion and belief, Defendant SMITH took no action regarding Plaintiff GENTRY's complaints.

219. In or around May 2020, Plaintiff GENTRY called HR/payroll and complained about his poor treatment, racial slurs, and hazardous conditions. Upon opinion and belief, no action was taken.

220. After the worksite to which Plaintiff GENTRY was assigned under Defendant BARNES was nearly complete, Plaintiff GENTRY was transferred to work at the Garage in or around early October 2020.

221. Plaintiff GENTRY was transferred to work under Defendant KRAMER, the Foreman at the Garage, who used racial epithets nearly as often as Defendant BARNES.  Plaintiff GENTRY spent significantly more time with Defendant KRAMER than the other Plaintiffs.

222. Defendant KRAMER started using racial slurs like "**nigger,**" "**nigga,**" and "**monkey**" on a daily basis during the first week when Plaintiff GENTRY was transferred to work in the Garage.  This was in front of coworkers and other supervisors on the worksite.

223. On a daily basis, Defendant BARNES would use similar racial epithets while supervising Plaintiff GENTRY.  One of many examples common to both Defendants included telling Plaintiff GENTRY, "**come over here nigga,**" when they wanted him to approach them.

224. On one occasion, while working with Defendant KRAMER in the Garage, he realized that he had left his hardhat in his car. When he told Defendant KRAMER he needed to retrieve it, he was told, "**nigga, you'll be fine without your hat**." Plaintiff GENTRY was forced to work without a hardhat until he was able to retrieve it later in the day.

225. Plaintiff GENTRY, like many other employees, would compare payroll information with other workers, comparing numbers on an app through which they were paid. On several occasions, Plaintiff GENTRY noticed new Caucasian workers with less or no experience being paid at a higher rate than himself.

226. On a roughly bi-monthly basis during his employment, Plaintiff GENTRY was paid for 40-hour weeks when he worked more than 40 hours.

227. On several occasions, Plaintiff GENTRY's pay deficit would be handled through a cash payment or personal check. On several other occasions, the deficit was never paid.

228. On a weekly basis, Plaintiff GENTRY would be denied breaks by Defendant BARNES and Defendant KRAMER. If he was found on break by Defendant SMITH, he would be disciplined and told to immediately return to work. This would include his 30-minute break for an 8-hour shift.

229. When being denied a break, Plaintiff GENTRY would often see Caucasian workers enjoying their breaks.

230. On or about December 2020, Plaintiff GENTRY contracted Covid near the height of the pandemic and began to develop symptoms.

231. When Plaintiff GENTRY reported this to Defendant SMITH, he was not permitted to take a sick day, and was told that he would be fired if he did.

232. Plaintiff GENTRY felt ill the next day but was similarly not allowed to leave the site when he reported this to Defendant SMITH.

233. Plaintiff GENTRY sought medical care at a local Urgent Care Center and tested positive for Covid.  Defendant SMITH told him to take one day off and not to tell anyone he tested positive for Covid, or he would be fired.

234. Upon opinion and belief, Caucasian workers were not denied sick days, nor were they threatened with termination if they shared their Covid status, nor were they restricted to a single sick day after testing positive for Covid.

235. In or around January 2021, Plaintiff GENTRY was approached and told to end his 30-minute lunch break early despite working 8 hours that day.  Plaintiff GENTRY again complained to Defendant SMITH about the racial slurs, having breaks denied or ended early, and other poor treatment due to race. He also stated that he would soon have to go to HR.

236. The day after threatening to speak with HR, Plaintiff GENTRY was told by Defendant SMITH that work was "slowing down."

237. Upon opinion and belief, Defendant REDBURN had just begun several new construction sites. Additionally, Plaintiff GENTRY was working on a site that had just recently been opened, and still had significant work to complete.

238. Plaintiff GENTRY was told that he would be called in if more work was available and a position opened.

239. Plaintiff GENTRY was never called back to work again and had been essentially terminated.

240. After Plaintiff GENTRY was fired, while picking up his last check on his old worksite approximately two weeks later, he noticed that several new Caucasian workers had been hired.

**Plaintiff TAYLOR**

241. Plaintiff TAYLOR repeats and realleges each and every allegation made in the above paragraphs of this complaint.

242. Plaintiff TAYLOR is a Black male.

243. Plaintiff TAYLOR had six months of prior construction experience with "Colonie Block" before working with Defendants.

244. Plaintiff TAYLOR started working for Defendant REDBURN in the Garage in July 2020 and was fired in April 2021.

245. Plaintiff TAYLOR worked approximately 45 – 55 hours per week and worked as many as approximately 70 hours in one week.

246. Plaintiff TAYLOR earned approximately $16 per hour, and $24 per hour for overtime work.

247. Plaintiff TAYLOR mostly did masonry work with the other Plaintiffs and other members of the "felony crew;" however, was regularly moved around between worksites and assignments as a gap-filler.

248. Plaintiff TAYLOR was often referred to as "Shaq," and Plaintiff TAYLOR and Plaintiff MCPHERSON were often referred to as "Shaq and Kobe," prominent Black basketball celebrities.

249. Defendant SMITH would often threaten to "sic Shaq and Kobe" on a Caucasian coworker and use the racial nicknames in an offensive manner.

250. In or around October 2020, Plaintiff TAYLOR was assigned to perform mold abatement at the Troy Worksite with a Caucasian worker, Fritz, who was soon replaced by Plaintiff MCPHERSON.  The details and conditions of this work are described *supra*.

251. In or around November 2020, Plaintiff TAYLOR was tricked into assisting Defendant SMITH and Defendant COLWELL into stealing fencing equipment for them as described *supra*.

252. In or around November 2020, Plaintiff TAYLOR was about 15 minutes late returning from a break. Plaintiff TAYLOR was approached by Defendant LEVIT and harshly criticized for his tardiness. Plaintiff TAYLOR was written up. At that time, two Caucasian workers who took their breaks at the same time as Plaintiff TAYLOR were returning, arriving later than Plaintiff TAYLOR. However, the Caucasian workers were not written up or admonished for their lateness.

253. Upon opinion and belief, the writeup was issued in an attempt to lay the groundwork for firing Plaintiff TAYLOR.

254. In or around October 2020, Plaintiff MCPHERSON and Plaintiff TAYLOR accepted the side job from Defendant SMITH described *supra*. As with Plaintiff MCPHERSON, Plaintiff TAYLOR was similarly not paid what was promised for the side work.

255. Plaintiff TAYLOR stated that he wanted to speak with Matthew Crudo about payment, and Defendant SMITH threatened to fire him if he did.

256. On approximately four separate occasions, Defendant SMITH or Defendant COLWELL demanded that Plaintiff TAYLOR accompany Defendant SMITH to assist Defendant COLWELL in driving his car home because Defendant COLWELL was too intoxicated to do so.

257. In or around late October 2020, after finishing work on the mold abatement in the OTB building at the Troy Worksite, Plaintiff TAYLOR was moved to work principally in the

Garage at the Albany Worksite, whose conditions became very hazardous in or around November 2020.

258. At a certain time, Plaintiff TAYLOR told Defendant SMITH that he had been exposed to Covid.  Defendant SMITH told him to keep it a secret.

259. Plaintiff TAYLOR began developing symptoms and tested positive for Covid the next day. When Plaintiff TAYLOR called in sick, he was told by Defendant SMITH that he would be fired if he told anyone that he tested positive for Covid.

260. At a certain time, Plaintiff TAYLOR was assigned to work on a worksite roof with a Caucasian worker, Fritz.  Despite doing the same job, the Caucasian worker had a safety harness, however, Plaintiff TAYLOR was told that there was no safety equipment for him. Plaintiff TAYLOR worked for about a month primarily on the roof with no safety harness.

261. On or about April 2021, Plaintiff TAYLOR arrived at the Schenectady Worksite and found Defendant LEVIT waiting for him to inform him that his services were no longer needed.

262. Plaintiff Taylor was fired approximately one week after Plaintiff SHERMAN was fired.

**Damages as to All Plaintiffs**

263. Plaintiffs were repulsed, offended, disturbed, humiliated, and disgusted by this blatantly unlawful racial harassment, discrimination, and hostile work environment.

264. Defendants created a hostile work environment which unreasonably interfered with Plaintiffs' ability to perform Plaintiffs' jobs.

265. The above are just some of the comments and conduct which contributed to the race-based hostile work environment that Plaintiffs experienced on a regular basis while employed by Defendants.

266. Defendants treated Plaintiffs this way solely due to Plaintiffs' race (Black).

267. Defendants acted intentionally and intended to harm Plaintiffs.

268. Defendants unlawfully harassed, humiliated, degraded, and belittled Plaintiffs. As a result, Plaintiffs suffer loss of rights, emotional distress, and loss of income.

269. Plaintiffs' performance was, upon information and belief, above average and satisfactory while working for Defendants.

270. Plaintiffs have also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

271. Defendants acted maliciously, willfully, outrageously, and with full knowledge of the law.

272. As such, Plaintiffs demands punitive damages as against all Defendants, jointly and severally.

**First Cause of Action for Discrimination
Under 42 U.S.C. §1981
(Not Against Individual Defendants)**

273. Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

274. 42 U.S.C. § 1981 states in relevant part as follows:

275. (a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every king, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. §1981

276. Plaintiffs, who are Black, were discriminated against because of their race as provided under 42 U.S.C. §1981 and has suffered damages as set forth herein.

## Second Cause of Action for Retaliation
## Under 42 U.S.C. § 1981 (As Amended)
## (Against All Defendants)

277. Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

278. By the acts and practices described above, Defendants retaliated against Plaintiffs for their opposition to unlawful discrimination under 42 U.S.C. § 1981.

279. Defendants acted with malice and/or reckless indifference to Plaintiffs' statutorily protected rights.

280. Defendants violated the sections cited herein as set forth.

281. Plaintiffs are entitled to the maximum amount allowed under this statute.

## Third Cause of Action for Discrimination
## Under the New York State Executive Law
## (Against all Defendants)

282. Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

283. New York State Executive Law § 296(1) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

284. Defendants violated the section cited herein as set forth.

**Fourth Cause of Action for Retaliation**
**Under the New York State Executive Law**
**(Against All Defendants)**

285. Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this

complaint.

286. New York State Executive Law § 296(1) provides that:

It shall be an unlawful discriminatory practice:

(e) For any employer, labor organization or employment agency to
discharge, expel or otherwise discriminate against any person
because he or she has opposed any practices forbidden under
this article or because he or she has filed a complaint, testified
or assisted in any proceeding under this article.

287. Defendants violated the sections cited herein as set forth.

288. Plaintiffs are entitled to the maximum amount allowed under this statute.

**Fifth Cause of Action for Discrimination**
**Under the New York State Executive Law**
**(Not Against Corporate Defendant)**

289. Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this

complaint.

290. New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory

practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden

under this article, or attempt to do so."

291. Defendant SMITH, Defendant BARNES, Defendant COLWELL and Defendant KRAMER

violated this statute as set forth.

**Jury Demand**

292. Plaintiffs request a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiffs respectfully request a judgment against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 1981 and the New York State Human Rights Law, New York State Executive Law § 296, *et seq.* in that Defendants discriminated against Plaintiffs based on Plaintiffs' race (Black), retaliated against Plaintiffs due to their complaints of discrimination and unsafe working conditions, and created and/or permitted a hostile work environment due to Plaintiffs' race;

B. Awarding damages to Plaintiffs resulting from Defendants' unlawful harassment, discrimination, unlawful termination and conduct and to otherwise make Plaintiffs whole for any losses suffered because of such unlawful employment practices;

C. Awarding Plaintiffs compensatory damages for mental and emotional injury, distress, pain, suffering, and injury to Plaintiffs' reputation in an amount to be proven;

D. Awarding Plaintiffs punitive damages;

E. Awarding Plaintiffs attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F. Awarding Plaintiffs such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
       November 10, 2022

                                        **PHILLIPS & ASSOCIATES,**
                                        **ATTORNEYS AT LAW, PLLC**

                              By:       _____
                                        Steven Fingerhut
                                        *Attorneys for Plaintiff*
                                        45 Broadway, Suite 430
                                        New York, New York 10006
                                        (212) 248-7431
                                        sfingerhut@tpglaws.com